```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  05/19/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                         :

UNITED STATES OF AMERICA,               :

                                 :

            -v-                    :       13 Cr. 411-02 (JMF)

                                 :

CAROLYN KAUFMAN,                 :       OPINION AND ORDER

                                 :

                       Defendant.     :

                                 :
-------------------------------------------------------------------X

JESSE M. FURMAN, District Judge:

On December 11, 2013, following a six-day jury trial, Carolyn Kaufman was convicted of all three counts with which she was charged: (1) conspiring to obstruct justice, in violation of Title 18, United States Code, Section 371; (2) obstruction of justice, in violation of Title 18, United States Code, Section 1503(a); and (3) perjury, in violation Title 18, United States Code, Section 1623.  Kaufman now moves for judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  For the reasons stated below, her motions are DENIED.

## BACKGROUND

The following brief background is drawn from the trial transcript ("Tr.") and from the Government's exhibits at trial ("GX").  The charges in this case grew out of an investigation by the United States Department of Labor ("DOL") regarding possible criminal activity at the National Basketball Players Association ("NBPA"), the union of players in the National Basketball Association.  As part of that investigation, the DOL examined the relationship between the NBPA and Prim Capital Corporation ("Prim"), a company located in Ohio that provided services to the NBPA and managed the NBPA's investments and finances.  In May 2012, the DOL served a federal grand jury subpoena on Prim, calling for the production of,

among other things, any and all contracts or agreements between Prim and the NBPA.  (GX 100).  In response to the subpoena, Prim produced various records, including a 2005 contract between Prim and the NBPA.  (GX 200).  No other contract was produced at that time.

Around the same time, the NBPA hired the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") to conduct an internal investigation of the union.  On or about January 15, 2013, shortly before Paul Weiss was to publicly issue a report critical of management at the NBPA, Prim produced to the DOL and Paul Weiss a copy of an alleged contract between Prim and the NBPA dated March 2011.  (GX 401).  Although the purported 2011 contract was similar in some respects to the 2005 contract, it included terms more favorable to Prim, including a provision stating that the agreement could not "be cancelled or revoked while in effect for any reason by the NBPA."  (*Id.* at 3).  The purported 2011 contract appeared to have been signed in March 2011 by Gary Hall, the NBPA's former General Counsel; Purvis Short, the NBPA's Director of Player Programs; and Joseph Lombardo, the founder and principal of Prim.  Paul Weiss's report, which was issued on January 17, 2013, questioned the validity of the purported contract, calling it "highly suspicious."  (Tr. 342-43).

On January 24, 2013, Lombardo was served with a federal grand jury subpoena requiring him to testify and produce certain materials regarding the purported 2011 contract to a grand jury in the Southern District of New York.  (GX 1000).  On February 5, 2013, Lombardo appeared before the grand jury and falsely testified that the purported 2011 contract was genuine and had been executed in or about March 2011.  (GX 1003, at 16-29).  In truth, Lombardo had created the purported 2011 contract in December 2011 — several months after the death of Gary Hall — with the assistance of a Prim employee named Douglas Creighton.  At that time, Creighton, acting at the direction of Lombardo, created a signature stamp of Hall's signature to be affixed to

2

the purported 2011 contract and backdated to March 2011.  In his February 5, 2013 grand jury appearance, Lombardo acknowledged that he knew the May 2012 DOL subpoena had called for all contracts, but claimed that he had directed Prim employees not to produce the purported 2011 contract because it could harm the then-head of the NBPA.  (*Id.* at 31-32).

After Lombardo's testimony, Kaufman — Prim's Chief Compliance Officer and effectively the firm's second-in-command after Lombardo — and Creighton were served with grand jury subpoenas calling for them to appear before the grand jury on February 21, 2013. (GX 1001-02).  In the period between February 5, 2013, and February 21, 2013, Lombardo engaged in several conversations with employees at Prim who had been involved in one way or another in creation of the sham contract or responding to the DOL subpoena regarding the purported 2011 contract and the expectation that others would be called to testify.  (GX 1101-03).  In those conversations, some of which were recorded, Lombardo made efforts to ensure that if the other employees were called to testify they would corroborate his false testimony about the timing and nature of the purported 2011 contract.  On February 19, 2013, two days before Kaufman and Creighton were scheduled to appear before the grand jury, Lombardo spoke with the two of them.  (GX 1104).  During that meeting, which Creighton surreptitiously recorded, Lombardo discussed with Kaufman some of the topics that she might be asked about in the grand jury, and appeared to coach her about some aspects of her testimony, including the date of the contract, Prim's fee structure under the contract, and a letter that Kaufman wrote that was hard to square with the existence of a new contract in 2011.  (GX 1104-T at 2-3).  During the conversation, Lombardo told Kaufman and Creighton that his "life" was "in [their] hands," to which Kaufman responded: "That's heavy."  (GX 1104-T at 2-3).

Two days later, Kaufman appeared before the grand jury in Manhattan.  To the extent relevant here, she testified that the purported 2011 contract was a real contract, that she had learned of its existence in March 2011, and that it had not been produced to DOL along with the first set of production because, as an email attachment, it was too large.  (GX 1004-T at 12-13, 21-23).  Kaufman claimed that the 2011 contract was produced in January 2013, "right before Paul Weiss' Report was completed," after they "[went] through to make sure everything was done before [they] had filed everything away in one of the storage boxes and decided to take another look just to be sure."  (*Id.* at 22).  When asked whether she had "talked[ed] with anyone about [her] coming to testify" that afternoon, "other than her lawyer," Kaufman responded: "Mr. Lombardo said he had been here and focusing on the contract, but not discussion with him about it.  And I did talk to my lawyer."  (*Id.* at 23).  Two days after Kaufman testified in the grand jury, a lawyer who had accompanied her there contacted one of the Assistant United States Attorneys involved in the matter to advise that Kaufman had incorrectly identified an employee of Prim as a lawyer.  (DX 323; Tr. 1108-09).  He did not correct any other portions of her testimony.

On April 22, 2013, Kaufman was charged in a criminal complaint with obstruction of justice.  Two days later, Kaufman was arrested.  In a post-arrest statement, Kaufman claimed falsely that she had not spoken to Lombardo about her grand jury testimony prior to her appearance before the grand jury and that she had not seen the purported 2011 contract "until 2013 when she was looking through boxes at Prim's office."  (Tr. 1006-07).  Just over one month later, the grand jury returned an indictment charging Lombardo and Kaufman together with conspiracy to obstruct justice and obstruction of justice and Lombardo alone with fraud offenses.  (Docket No. 16).  On October 31, 2013, after Lombardo had pleaded guilty, the grand jury returned a superseding indictment charging Kaufman with conspiracy to obstruct justice (Count

One), obstruction of justice (Count Two), and perjury (Count Three).  (Docket No. 80).  The

perjury count specified two sets of alleged false statements: (1) her testimony, in answer to the

question of when she had "learn[ed] that a new contract had, in fact, been executed," that she had

learned "[s]ometime in March . . . 2011"; and (2) her testimony, in answer to the question of

whether she had "talk[ed] with anyone about [her] coming to testify this afternoon, other than

[her] lawyer, before [she] came here," that "Mr. Lombardo said he had been here and focusing

on the contract, but no discussion with him about it."  (Docket No. 80).

## THE MOTION FOR JUDGMENT OF ACQUITTAL

Rule 29(a) requires the court to "enter a judgment of acquittal of any offense for which

the evidence is insufficient to sustain a conviction."  A defendant challenging the sufficiency of

the evidence under Rule 29 bears a "heavy burden," *United States v. Gaskin*, 364 F.3d 438, 459

(2d Cir. 2004), as the standard of review is "exceedingly deferential," *United States v. Hassan*,

578 F.3d 108, 126 (2d Cir. 2008).  A court "must view the evidence in the light most favorable to

the government, crediting every inference that could have been drawn in the government's favor,

and deferring to the jury's assessment of witness credibility and its assessment of the weight of

the evidence," *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (alterations, citations,

and internal quotation marks omitted), and it must affirm the conviction if "*any* rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v.

Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Guadagna*, 183 F.3d 122, 130 (2d

Cir. 1999) (stating that a court may overturn a jury's verdict only if the evidence supporting the

verdict is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable

doubt" (internal quotation marks omitted)).  Moreover, in reviewing the record, the evidence

must be analyzed "not in isolation but in conjunction."  *United States v. Diaz*, 176 F.3d 52, 89

(2d Cir. 1999).

A defendant's knowledge of a crime and his participation in it with criminal intent may,

like any element of a crime, be established through circumstantial evidence.  *See, e.g.*, *United*

*States v. Gordon*, 987 F.2d 902, 906-07 (2d Cir. 1993); *see also, e.g.*, *United States v. Santos*,

553 U.S. 507, 521 (2008) (plurality opinion) (observing that "knowledge must almost always be

proved . . . by circumstantial evidence"); *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir.

2004) (stating that "the government is entitled to prove its case solely through circumstantial

evidence").  Additionally, a "conviction may be sustained on the basis of the testimony of a

single accomplice, so long as that testimony is not incredible on its face and is capable of

establishing guilt beyond a reasonable doubt."  *Diaz*, 176 F.3d at 92 (internal quotation marks

omitted).  "Any lack of corroboration of an accomplice's or co-conspirator's testimony goes

merely to the weight of the evidence, not to its sufficiency, and a challenge to the weight is a

matter for argument to the jury, not a ground for reversal . . . ."  *Id.* (alterations and internal

quotation marks omitted).

Where, as here, a defendant challenges a conspiracy conviction, "deference to the jury's

findings is especially important . . . because a conspiracy by its very nature is a secretive

operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the

precision of a surgeon's scalpel."  *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008)

(internal quotation marks omitted).  Moreover, the evidence necessary to link a defendant to a

conspiracy "may be circumstantial in nature."  *In re Terrorist Bombings of U.S. Embassies in E.*

*Africa*, 552 F.3d 93, 113 (2d Cir. 2008) (internal quotation marks omitted).  In fact, the Second

Circuit has observed that "a defendant's knowing agreement to join a conspiracy must, more

often than not, be proven through circumstantial evidence." *United States v. Lorenzo*, 534 F.3d 153, 161 (2d Cir. 2008) (emphasis added) (internal quotation marks omitted).  Thus, for example, a defendant's "knowing and willing participation in a conspiracy may be inferred from," among other things, her "presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others."  *In re Terrorist Bombings*, 552 F.3d at 113 (internal quotation marks omitted).  It "may also be established by evidence that the defendant participated in conversations directly related to the substance of the conspiracy [or] possessed items important to the conspiracy."  *Id.* (internal quotation marks omitted).

Applying these standards here, Kaufman's challenge to the sufficiency of the evidence is meritless.  Significantly, there is — and can be — no real dispute that some of Kaufman's testimony before the grand jury was false.  The undisputed and overwhelming evidence showed that the purported 2011 contract was a fraud, that it did not even exist until December 2011, and that it was purposefully withheld by Lombardo in response to the initial DOL subpoena.  (*See, e.g.*, GX 501, 502, 503, 904, 906, 907, 923, 1204).  It follows, for example, that Kaufman could not have learned about the contract in March 2011, as she testified.  (*See* GX 1004-T at 12-13).  Nor could a letter that she wrote in December 2011 requesting increased compensation for Prim have referenced the purported 2011 contract, as she told the grand jury.  (*Compare* GX 606, *with* GX 1004-T at 19-20).  And it is not the case that the purported 2011 contract was produced only in January 2013 because Prim discovered it at that time, as she claimed.  (*Compare* GX GX 1004-T at 21-22, *with* Tr. 899-900).  Kaufman's principal argument is rather that the evidence was insufficient to support a finding that she knew her statements were false.  (Carolyn Kaufman's Renewed Mot. J. Acquittal (Docket No. 149) ("Rule 29 Mem.") 4-16; *see also* Reply

to United States' Opp'n Carolyn Kaufman's Mot. J. Acquittal and New Trial (Docket No. 152) ("Reply Mem.") 1, 5 (distinguishing between "factual falsity" and "knowledge of falsity")). She argues, as she did at trial, that she was deliberately misled by Lombardo and Creighton about the propriety and production of the purported 2011 contract, and that her testimony — while false — was not knowingly false or in bad faith. (Rule 29 Mem. 10-13).[1]

Upon review of the entire record, the evidence in this case was plainly sufficient for the jury to reject these arguments, and to support its finding beyond a reasonable doubt that Kaufman knew (or was willfully blind to the fact that) the purported 2011 contract was a fake and, by extension, that she committed the crimes charged in the superseding indictment. In fact, the jury could infer as much from the recording of the February 19, 2013 conversation with Lombardo alone. (GX 1104; *see also* GX 1104-T). During that conversation, which took place only one day before Kaufman traveled to New York to testify before the grand jury, Kaufman and Lombardo discussed "the new contract," a clear reference to the sham 2011 contract. (GX 1104-T at 2). Drawing all inferences in favor of the Government, Lombardo coached Kaufman on what she would likely be asked about in the grand jury and what she should say. (*Id.* at 1-3). For example, Lombardo told Kaufman: "[I]f they ask you about" the agreement between Prim

---

[1]     Without citation to the record or case law, Kaufman asserts in a footnote that there was "insufficient evidence that any of the purported false or misleading statements was material." (Rule 29 Mem. 10 n.3). That conclusory assertion does not suffice to raise or preserve the argument. *See, e.g.*, *United States v. Barnes*, 158 F.3d 662, 673 (2d Cir. 1998); *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993). In any event, the argument is meritless, as her statements plainly had "it "a natural effect or tendency to influence, impede, or dissuade the grand jury from pursuing its investigation." *United States v. Regan*, 103 F.3d 1072, 1084 (2d Cir. 1997) (internal quotation marks omitted); *see also id.* (noting also that "[c]ourts have broadly construed materiality" and that "[a] statement in grand jury proceedings is material if a truthful answer *could* conceivably *have aided* the grand jury investigation" (internal quotation marks omitted) (emphasis in original)).

and the NBPA, "our whole thing was we were gonna consolidate it, we were gonna just take a flat fee . . . this is the only other thing that uh, you should know about, that they may ask you about." (GX 1104-T at 2). Kaufman replied, "[r]ight" "ok." (*Id.* at 2). Significantly, Lombardo twice told Kaufman that his "life" was in her hands, to which Kaufman responded, "[t]hat's heavy." (*Id.*). As if to summarize the object of their conspiracy, Lombardo stated to Creighton and Kaufman: "I told my wife my life is in your hands and Carolyn's hands, okay? That, the dates on the contract and you saw the names on the contract, uh, after this, they're not going to call us anymore." (*Id.* at 3). Drawing all permissible inferences in the Government's favor, as the Court must, a reasonable jury could have concluded (as the Government argued in summation (Tr. 1146, 1164-70) and argues here (Mem. Law United States America Opp'n Def.'s Mot. J. Acquittal and New Trial (Docket No. 151) ("Gov't Mem.") 12-15)) that that conversation — when viewed in light of Kaufman's false testimony two days later — was part of an ongoing conspiracy to conceal the fraudulent nature of the 2011 contract from the grand jury.

In any event, there was significantly more evidence to support the jury's finding than the February 19, 2013 recording. That evidence included — but was not limited to — the following:

- the fact that Kaufman failed to alert Paul Weiss to existence of the purported 2011 contract when she was interviewed in connection with the law firm's internal investigation on behalf of the NBPA (Tr. 334, 337-38);

- the fact that Lombardo had told Kaufman that the purported 2011 contract had been withheld intentionally because the then head of the NBPA did not want it produced out of concerns that it "would be damaging" (Tr. 539-40, 900);

- the report publicly issued in January 2013 by Paul Weiss, which questioned the validity of the purported 2011 contract, calling it "highly suspicious" (Tr. 342-43; 982);

- a letter addressed to Kaufman from a representative of the NBPA referring to the purported 2011 contract as a document that "purports to be a contract" (DX 49);

- the fact that Creighton did not give Kaufman a direct answer when she asked why people were so interested in the purported 2011 contract (Tr. 816);

- a recording only days after Kaufman's grand jury testimony in which Lombardo reveals his understanding that Kaufman had backed his story (GX 1106);

- Creighton's testimony that, when told that Creighton had retained his own attorney, Kaufman had appeared "extremely terrified as if she had seen a ghost" (Tr. 616:23-17:12); and

- Kaufman's false post-arrest statements (that she did not speak to Lombardo about her grand jury testimony prior to her appearance and had not seen the purported 2011 contract "until 2013 when she was looking through boxes at Prim's office" (Tr. 1006-07).

Taken together, that evidence — as well as evidence of, for example, Kaufman's position and role at Prim, including her role in collecting and producing documents responsive to the DOL subpoena (Tr. 218, 221, 225, 450-51, 519-20, 525-26; GX 602, 604, 607, 706); her (unusual) private conversations with Lombardo leading up to her grand jury testimony (Tr. 568); and her efforts to reach him by telephone after her testimony (GX 507; *see* Tr. 1173-74) — supported the jury's conclusion that Kaufman knew the contract was a sham and had been deliberately withheld and agreed with Lombardo to obstruct the grand jury's investigation into the matter.  At a minimum, "with all of these red flags flying," the jury "could reasonably infer that" Kaufman "was conscious that [s]he was playing a part in a fraudulent scheme, even though [s]he may not have known all of the details."  *United States v. Panza*, 750 F.2d 1141, 1150 (2d Cir. 1984).

Most of Kaufman's arguments to the contrary do not warrant discussion, as they amount to little more than rearguing points that were made to, and rejected by, the jury.[2]  Put another

---

[2]     The one argument that Kaufman makes that warrants brief comment is her contention that the question giving rise to the second perjury specification — namely, whether she had discussed her grand jury testimony with anyone other than her lawyer — was fundamentally ambiguous.  (Rule 33 Mem. 13-16).  That contention is both immaterial and without merit.  It is immaterial for two reasons: first, because the jury found Kaufman guilty of both specifications, so even if the question giving rise to the second specification was fatally ambiguous, the

way, Kaufman's arguments largely depend on drawing inferences from disputed evidence in her favor.  Those inferences may well be permissible, but they are not compulsory, and the law is clear that in reviewing Kaufman's Rule 29 motion, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *Chavez*, 549 F.3d at 124 (alterations, citations, and internal quotation marks omitted).  Doing that here, and considering the evidence "not in isolation but in conjunction," *Diaz*, 176 F.3d at 89, there is no question that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson*, 443 U.S. at 319.  Accordingly, Kaufman's Rule 29 motion must be, and is, denied.

## THE MOTION FOR A NEW TRIAL

As noted, Kaufman also moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  That Rule provides, in relevant part, that a court "may vacate any judgment and grant a new trial if the interest of justice so requires."  A district court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and [only] in 'the most extraordinary circumstances.'"  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  In exercising its broad

---

evidence was sufficient to support the jury's verdict in its entirety; and second, because Kaufman's answer was false even if the question is understood to refer not to the substance of her grand jury testimony or to the contract, but to the topics that Kaufman suggests.  (Rule 29 Mem. 14).  The contention is without merit because, read in context (including both the preceding colloquy and Kaufman's answer), the question at issue is not "*so* vague as to be 'fundamentally ambiguous.'"  *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986) (emphasis added); *see also United States v. Markiewicz*, 978 F.2d 786, 808-09 (2d Cir. 1992).

discretion under Rule 33, a district court "is entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Sanchez*, 969 F.2d at 1413 (internal quotation marks omitted). Significantly, however, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Id.*; *see also, e.g.*, *United States v. McCourty*, 562 F.3d 458, 476 (2d Cir. 2009) ("[W]here the resolution of the Rule 33 motion depends on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." (alterations and internal quotation marks omitted)). "The 'ultimate test' is 'whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been convicted.'" *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (quoting *Ferguson*, 246 F.3d at 133); *accord McCourty*, 562 F.3d at 475; *see also, e.g.*, *United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution.").

In this case, Kaufman moves for a new trial on seven different grounds. First, she contends that the verdict was against the weight of the evidence, largely repeating (or incorporating by reference) the arguments she made in support of her Rule 29 motion. (Carolyn Kaufman's Mot. New Trial (Docket No. 148) ("Rule 33 Mem.") 23-25; Reply Mem. 8 n.9). Second, she alleges that a new trial is warranted because: (1) the Court erred in giving a conscious-avoidance instruction; (2) the Court erred in *not* giving a multiple-conspiracies instruction; (3) the testimony of David Brown, a partner at Paul Weiss, violated the Confrontation Clause; (4) the Court erred in admitting recordings of Lombardo speaking with Purvis Short in January 2013 and Bill DiTirro in February 2013; (5) the Court erred in admitting a recording of Lombardo speaking with Creighton on February 28, 2013; and (6) the Court erred

in admitting the audio recording of Kaufman's grand jury testimony.  The Court need not address Kaufman's weight-of-the-evidence arguments, as they fail substantially for the reasons that her motion for judgment of acquittal failed.  Put simply, the evidence was sufficient for the jury to find Kaufman guilty, and the Court does not have any concern, let alone a "real concern," that an innocent person may have been convicted.  *Canova*, 412 F.3d at 349 (internal quotation marks omitted).  The Court will address the remaining arguments in turn.

## A.  The Court Did Not Err in Giving a Conscious-Avoidance Instruction

Kaufman's first claim is that the Court erred in giving a conscious-avoidance (or willful-blindness) instruction.[3]  Although the conscious-avoidance doctrine may not be used to prove intent to join a conspiracy — because "it is logically impossible to intend and agree to join a conspiracy if a defendant does not know of its existence" — it may be used to prove that the defendant had knowledge of the conspiracy's unlawful objectives.  *United States v. Reyes*, 302 F.3d 48, 54-55 (2d Cir. 2002).  Indeed, the Second Circuit has described the doctrine as "a practical necessity given the ease with which a defendant could otherwise escape justice by deliberately refusing to confirm the existence of one or more facts that he believes to be true." *Id.* at 54.  For an instruction to be given, two factual predicates must be present.  *See id.* (stating that where the predicates are satisfied "[c]ourts in this Circuit commonly give the jury a conscious avoidance instruction").  First, the defendant must "assert[] the lack of some specific aspect of knowledge required for conviction."  *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) (internal quotation marks omitted).  And second, there must be evidence that allows a rational juror to "reach the conclusion beyond a reasonable doubt that the defendant was aware

---

[3]     Kaufman does not challenge the language of the Court's conscious-avoidance instruction. Nor could she, as she expressly approved of the language at trial.  (Tr. 1084).

of a high probability of the fact in dispute and consciously avoided confirming that fact." *Id.* (internal quotation marks omitted).  "Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." *Id.*

Applying those standards here, there is no question that the Court properly instructed the jury on conscious avoidance.  As the Court observed during trial (and as discussed above in reference to Kaufman's Rule 29 motion), there was "abundant evidence . . . of red flags in this case" (Tr. 1085), including but not limited to the fact that Lombardo told Kaufman that the purported 2011 contract was withheld intentionally (Tr. 539-40, 900); the fact that the Paul Weiss report questioned the validity of the purported 2011 contract, calling it "highly suspicious" (Tr. 342-43; 982); the letter addressed to Kaufman from a representative of the NBPA referring to the purported 2011 contract as a document that "purports to be a contract" (DX 49); the fact that Creighton was unwilling to give Kaufman "a direct answer" when asked about why investigators were interested in the purported March 2011 contract (Tr. 816); and the fact that Prim's lawyer had reason to doubt both the enforceability and validity of the purported March 2011 contract before anyone from Prim testified before the grand jury (Tr. 982).

In arguing otherwise, Kaufman principally repeats the arguments she makes in her Rule 29 motion (and made to the jury) for why the evidence showed that she did not know that the contract was a fraud or deliberately withheld and that she was misled by Lombardo and Creighton.  (Rule 33 Mem. 2-8; Reply Mem. 8-10).  As discussed above, however, although that may be a permissible view of the evidence, it is not the only — or even most compelling — view.  A rational jury could certainly have found beyond a reasonable doubt that Kaufman was "aware of a high probability" that the contract was fake or had been deliberately withheld and "consciously avoided confirming that fact." *Ferguson*, 676 F.3d at 278 (internal quotation marks

omitted).  Kaufman also questions the jury charge on the ground that the Government principally

(or exclusively) argued actual knowledge in summations.  (Rule 33 Mem. 5).  But the law is

clear that "[t]he government need not choose between an actual knowledge and a conscious

avoidance theory."  *Ferguson*, 676 F.3d at 678; *see also United States v. Goffer*, 721 F.3d 113,

127 (2d Cir. 2013) (rejecting the defendant's "argument that the Government's evidence sought

to prove actual knowledge rather than conscious avoidance" as "irrelevant").  "The same

evidentiary facts that supported the government's theory of actual knowledge also raised the

inference that [s]he was subjectively aware of a high probability of the existence of illegal

conduct and thus properly served as the factual predicate for the conscious avoidance charge."

*United States v. Cuti*, 720 F.3d 453, 464 (2d Cir. 2013).

      In any event, any error in giving the conscious-avoidance instruction was harmless for

several reasons.  *See, e.g.*, *United States v. Quinones*, 635 F.3d 590, 595 (2d Cir. 2011) (stating

that if a defendant shows that there was an insufficient factual predicate for a conscious-

avoidance instruction, "the salient question is whether any error would have been prejudicial to

the defendant[]").  First and foremost, despite Kaufman's assertions to the contrary (Reply Mem.

10-11), the conscious-avoidance instruction was given only in reference to Count One, the

conspiracy charge.  (Tr. 1273-75).  With respect to Counts Two and Three, which charged

Kaufman with the substantive crimes of obstruction of justice and perjury, respectively, the

Court instructed the jury that it had to find that Kaufman knew that her testimony was false and

misleading in order to convict (Tr. 1263-64, 1266, 1277, 1279-80), and did not cross-reference

the conscious-avoidance instruction.  (*Cf.* Tr. 1270 (expressly incorporating by reference

instructions previously given with respect to a different count)).  It follows from the verdict on

those counts that the jury found that she had actual knowledge that her testimony before the

grand jury was false and misleading.  *See, e.g.*, *United States v. Mavashev*, 455 F. App'x 107, 111 (2d Cir. 2012) (summary order) (relying, in similar circumstances, on the jury's verdict with respect to other counts to conclude that the jury made a finding of actual knowledge and holding, in part on that basis, that an erroneous conscious-avoidance instruction was harmless).  Second, the Government did not argue conscious avoidance in its summations, and relied exclusively on actual knowledge, so it is "highly unlikely that the jury convicted [Kaufman] based on a conscious avoidance theory." *Id.*  Third, as discussed above, there was compelling evidence that Kaufman had actual knowledge that the contract was a sham (or at least that it was not signed in March 2011) and intentionally withheld.  *See, e.g.*, *United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003) ("[A]n unwarranted conscious avoidance instruction is harmless error where there is overwhelming evidence of actual knowledge." (internal quotation marks omitted)).  And finally, to the extent that the evidence was insufficient to support a finding of conscious avoidance, the Court can and does "presume that the jury convicted [Kaufman] on the basis of actual knowledge" because "the jury was instructed not to apply the doctrine unless there was sufficient evidence to prove conscious avoidance beyond a reasonable doubt." *United States v. Adeniji*, 31 F.3d 58, 63 (2d Cir. 1994).

## B.  The Court Did Not Err in Declining to Give a Multiple-Conspiracies Charge

Kaufman's next argument — that a new trial is warranted based on the Court's failure to give a multiple conspiracies charge — borders on frivolous.  In order to obtain a new trial on the ground that a court failed to grant a request for a multiple conspiracy charge, a defendant "must show both that there was evidence of separate networks operating independently of each other and that he suffered substantial prejudice resulting from the failure to give the requested charge." *United States v. Cusimano*, 123 F.3d 83, 89 (2d Cir. 1997) (internal quotation marks omitted).

16

More specifically, to show "substantial prejudice," the defendant must "prove that the evidence in support of the conspiracy or conspiracies in which he did not participate prejudiced the case against him with respect to the conspiracy to which he was a party." *Id.* The Second Circuit has emphasized that it "is generally more difficult to make such a showing where . . . the trial was a short trial involving a single defendant." *Id.* (citing *United States v. Harris*, 8 F.3d 943, 947 (2d Cir. 1993)); *see also United States v. Restrepo*, 547 F. App'x 34, 41 (2d Cir. 2013) (summary order); *United States v. Aguilar*, 352 F. App'x 522, 525 (2d Cir. 2009) (summary order). In fact, on several occasions, the Court of Appeals has gone so far as to say that "'single/multiple conspiracy analysis does not apply to the trial of a single defendant.'" *United States v. Ling*, 172 F. App'x 365, 366 (2d Cir. 2006) (summary order) (quoting *United States v. Corey*, 566 F.2d 429, 431 n.3 (2d Cir. 1977)); *see also, e.g.*, *United States v. Sir Kue Chin*, 534 F.2d 1032, 1035 (2d Cir. 1976); *United States v. Atkins*, No. 10 Cr. 391 (CM), 2012 WL 1415625, at *2 (S.D.N.Y. Apr. 19, 2012); Sand et al., *Modern Federal Jury Instructions: Criminal*, Instruction 19-5 Commentary (2013) (citing cases).

To the extent that the "single/multiple conspiracy analysis" applies in this single-defendant case at all, Kaufman has not, and cannot, show substantial prejudice from the Court's failure to give a multiple conspiracies charge, for at least two reasons. First, although the Court did not give a multiple-conspiracies charge *per se*, it gave a copy of the indictment to the jury (Tr. 1261) and repeatedly instructed the jury that, to find Kaufman guilty of Count One, it had to find that she and at least one other person "entered into *the* unlawful agreement *charged in the indictment*." (Tr. 1268 (emphasis added)). It further instructed the jury that the object of that conspiracy was the obstruction of justice and that Kaufman could not be found guilty if the jury found "that she believed that the conspiracy involved a goal other than obstructing justice." (Tr.

17

1269-71).  Finally, the Court instructed the jury that the indictment charged that "*the* conspiracy

existed from in or about January 2013 through in or about April 2013" (Tr. 1270 (emphasis

added)), a date range that corresponded to the charge of obstruction of justice but did not

correspond at all to the allegations of fraud in connection with the creation of the sham contract

in the first instance.  Those instructions, taken together, ensured that the jury, in convicting

Kaufman, found her guilty of having participated the charged conspiracy.  Any possible doubt is

dispelled by the Court's unambiguous limiting instructions — using language agreed to by the

parties — that Kaufman was "not charged in the indictment with creating the purported March

2011 contract or with intentionally withholding it from production" and that the jury therefore

"should not find Ms. Kaufman guilty of the crimes she is charged with merely because the

government has offered evidence that the purported March 2011 contract was fraudulent and/or

that it was intentionally withheld."  (Tr. 491).  In light of these instructions, which the jury is

presumed to have followed, *see, e.g.*, *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006),

Kaufman has not, and cannot, show substantial prejudice from the Court's refusal to give a

multiple conspiracies instruction.

## C.  Brown's Testimony Did Not Violate the Confrontation Clause

Kaufman's contention that Brown's testimony violated the Confrontation Clause comes

even closer to qualifying as frivolous.  The Confrontation Clause "guarantees only 'an

opportunity for effective cross-examination, not cross-examination that is effective in whatever

way, and to whatever extent, the defense might wish.'"  *United States v. Owens*, 484 U.S. 554,

559 (1988) (emphasis omitted) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)); *accord*

*United States v. Laljie*, 184 F.3d 180, 192-93 (2d Cir. 1999).  Here, unlike the cases upon which

Kaufman relies (Rule 33 Mem. 11-14; Reply Mem. 11-12), the Court imposed no relevant

18

restrictions whatsoever on the scope of cross-examination of Mr. Brown.  Counsel was permitted to (and did) effectively cross-examine (and re-cross-examine) Mr. Brown at length (Tr. 343-402, 410-17), concerning, among other things, whether Brown ever reviewed notes or any other written summary of Kaufman's interview (Tr. 401), his ability to recall what Kaufman said during that interview (Tr. 395-401), and an e-mail from one of Brown's colleagues to Kaufman describing her as having been "very helpful" during the interview (Tr. 396-397).  In short, cross-examination of Brown's testimony was not curtailed at all.  And in any event, the jury was plainly "in possession of facts sufficient to make a discriminating appraisal of [his] credibility." *Laljie*, 184 F.3d at 192 (internal quotation marks omitted); *accord Howard v. Walker*, 406 F.3d 114, 129 (2d Cir. 2005); *see also, e.g.*, *Mills v. Singletary*, 161 F.3d 1273, 1288 (11th Cir. 1998) (per curiam) ("A defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witnesses and enables defense counsel to establish a record from which he can properly argue why the witness is less than reliable.").

Significantly, Kaufman's confrontation argument is ultimately premised not on any restrictions the Court placed on the scope of cross-examination — there were no relevant restrictions — but on denial of her pretrial request, pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure, for notes taken of her interview with Brown.  (Rule 33 Mem. 11-14; Reply Mem. 11-12).  Notably, however, Kaufman does not cite any authority for the proposition that the quashing of a Rule 17(c) subpoena, even if erroneous, constitutes a violation of the Confrontation Clause.  *Cf. United States v. Shrader*, 716 F. Supp. 2d 464, 473-74 (S.D. W.Va. 2010) (holding that the defendant's "ability to cross-examine [the alleged victim] does not include the power to require the pretrial disclosure of the [otherwise privileged] records because

the records might be useful in contradicting unfavorable testimony"). Even more notably, Kaufman does not, and cannot, make any argument that the Court erred in quashing her Rule 17(c) subpoena. Even now, Kaufman argues only that she needed the notes (which were not taken, or even reviewed by, Brown himself) for impeachment purposes. It is well established, however, that Rule 17(c) does not provide a basis for pre-trial "production of materials whose evidentiary use is limited to impeachment." *United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) (collecting cases); *accord United States v. Nelson*, No. 10 Cr. 414 (PKC), 2011 WL 2207584, at *4 (S.D.N.Y. June 3, 2011). Moreover, given the totality of the circumstances — including, most notably, the fact that Kaufman *herself* was present at the interview in question and could therefore assist counsel in formulating questions to impeach Brown's testimony — Kaufman did not even come close to establishing sufficient need for the notes to overcome Paul Weiss's concededly valid invocation of work-product privilege. *See, e.g.*, *United States v. Weisberg*, No. 08-CR-347 (NGG) (RML), 2011 WL 1327689, at *3-5 (E.D.N.Y. Apr. 5, 2011) (discussing the interaction between Rule 17(c) and work-product privilege). The bottom line is that Kaufman obtained all the materials to which she was entitled under the law and was given a full, and unfettered, opportunity to make use of those materials in cross-examining Brown.

**D. The Court Did Not Err in Admitting the Recordings from January and February 2013**

Kaufman's next contention — that she is entitled to a new trial based on the admission of recordings of four conversations between Lombardo and others (Rule 33 Mem. 14-17; Reply Mem. 13) — can be swiftly rejected. Count One of the Indictment charged Kaufman with conspiring with Lombardo. A conspiracy, of course, is "an agreement among the conspirators. A meeting of the minds is required." *United States v. Rosenblatt*, 554 F.2d 36, 38 & n.2 (2d Cir. 1977) (citations and internal quotation marks omitted). Thus, the relevance of Lombardo's state

of mind in the period leading up to Kaufman's grand jury testimony was anything but "minimal," as Kaufman insists (Rule 33 Mem. 15); it was central. And the recordings at issue were highly probative of that state of mind — most obviously, with respect to Lombardo's meaning and intent during the critical February 19, 2013 conversation with Kaufman. Contrary to Kaufman's assertions, the jury was indeed entitled to infer from the fact that Lombardo "invited" everyone else who was in a position to reveal his fraud to the Government to enter a conspiracy to obstruct justice that, in the February 19, 2013 meeting with Kaufman (not to mention other the meetings that the two had behind closed doors), Lombardo "extended the same invitation to Ms. Kaufman." (Rule 33 Mem. 15).[4] The fact that Kaufman herself was not involved in the recorded conversations at issue is of no moment. The recordings were plainly relevant to Lombardo's state of mind, which, in turn, was plainly relevant to Kaufman's guilt. *Cf., e.g.*, *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (noting that "while idle chatter" by a co-conspirator is not admissible as a co-conspirator statement, it may be "admissible . . . under the state of mind hearsay exception"); *United States v. Green*, 887 F.2d 25, 27 (1st Cir. 1989) (per curiam) (upholding the admission of statements by a co-conspirator to prove intent).

Further, the probative value of the recordings is not outweighed, let alone "substantially," by the danger of "unfair prejudice . . . or needlessly presenting cumulative evidence." Fed. R.

---

[4]     Kaufman is on firmer ground in contending that the recordings at issue say "nothing about . . . whether she accepted" Lombardo's invitation to enter into a conspiracy to obstruct justice. (Rule 33 Mem. 15). But that has no legal significance for present purposes. That is, the fact that the evidence was not, by itself, sufficient to convict Kaufman of agreeing with Lombardo does not make it irrelevant. To the extent that the Government was required to prove both an invitation from Lombardo and an acceptance of that invitation by Kaufman, evidence tending to show Lombardo's invitation is obviously relevant. As discussed above, other evidence in the record — in particular, the February 19, 2013 meeting and the grand jury testimony — suffices to support the jury's finding that Kaufman accepted the invitation.

Evid. 403.  First, as the Government notes, the recordings "were a relatively insignificant part of the Government's proof.  The Government did not even play for the jury two of the . . . recordings.  The recordings were briefly mentioned twice in the Government's closings . . . ." (Gov't Mem. 24 (citing Tr. 1171, 1235)).  Second, any danger of unfair prejudice was mitigated, if not eliminated, by the Court's limiting instructions.  As noted above, the Court instructed the jury that Kaufman was "not charged in the indictment with creating the purported March 2011 contract or with intentionally withholding it from production" and that it "should not find Ms. Kaufman guilty of the crimes she is charged with merely because the government has offered evidence that the purported March 2011 contract was fraudulent and/or that it was intentionally withheld."  (Tr. 491).  In addition, the Court gave an unambiguous limiting instruction specific to the recordings at issue themselves (and largely adopted from Kaufman's own proposed limiting instruction (Docket No. 130)), cautioning the jury that it could "consider that evidence *only* in evaluating the state of mind or intent of those who participated in those communications or those who may have overheard those communications" and that it could "*not* consider those communications as evidence of Ms. Kaufman's state of mind or intent, or as evidence of an overt act in furtherance of the charged conspiracy."  (Tr. 1107-08 (emphasis added)).  Those instructions were more than adequate to address any danger of unfair prejudice.  *See, e.g.*, *United States v. Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010) (upholding a Rule 403 determination where the district court minimized the risk of unfair prejudice through limiting instructions); *United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009) (same).

**E.  The Court Did Not Err in Admitting the February 28, 2013 Recording**

Kaufman also seeks to revisit the Court's ruling that the recording of a conversation between Lombardo and Creighton on February 28, 2013, was admissible as a coconspirator

statement, pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence.  (Rule 33 Mem. 17-20; Reply Mem. 13-15).  The Court made its ruling after thorough briefing and argument by the parties (Docket Nos. 118, 124; Tr. 45-56), and Kaufman presents no new arguments in her present motion.  As with those she made before trial, Kaufman's arguments proceed from a false premise: that she was charged with conspiracy to provide false testimony before the grand jury and that the conspiracy therefore ended with her testimony before the grand jury on February 21, 2013.  (Rule 33 Mem. 17-18).  The charge in Count One, however, was a conspiracy to obstruct justice, and — in light of the ongoing grand jury investigation, not to mention evidence of acts after February 21, 2013 (including, but not limited to, additional communications between Lombardo and Kaufman; Kaufman's efforts to correct some, but not all, of her grand jury testimony; and Kaufman's false and misleading statements on the day of her arrest) — there is no basis to conclude that that conspiracy was over on February 28, 2013.  Notably, the Second Circuit has held that "[w]here the government has presented sufficient evidence to show a conspiracy that has continuing purposes or goals" — as it did here — "the burden is on the defendant to prove that the conspiracy was terminated or that he took affirmative steps to withdraw."  *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008).  Moreover, "[t]o show that the conspiracy was terminated, the defendant needs to present evidence from which the jury could find that the goals of the conspiracy were accomplished *in some final manner*."  *Id.* (alterations and internal quotation marks omitted) (emphasis in original).  Here, there was no proof that the goals of the conspiracy were fully accomplished on February 21, 2013.

Whether Lombardo's statements in the recording were in furtherance of the conspiracy is admittedly a closer question, but the Court finds that they were, substantially for the reasons stated in granting the Government's motion *in limine* to introduce the evidence.  (Tr. 55-56).

23

That is, the statements were intended to prompt Creighton "to respond in a way that promote[d] or facilitate[d]" the conspiracy, *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990), and to "facilitate and protect" the conspiratorial activities by obtaining reassurance that Creighton was either on board (something Lombardo did not necessarily know as of February 28, 2013) or had not done anything to jeopardize the objectives of the conspiracy, *Diaz*, 176 F.3d at 87.  (Tr. 55; *see also* Tr. 56 (finding that, "[i]n essence, . . . the [recording] is an effort to groom Mr. Creighton to ensure that he didn't say anything that was inconsistent with the . . . conspirators' account" and "in order to find out whether he did, which would obviously endanger the conspiratorial objectives"); *id.* (finding that "the statement was either an effort to entice him to share in the objectives of the conspiracy or to find out whether and to what extent he had undermined them")).  In any event, even if the Court erred in making that call, any error was plainly harmless, as the thirty-second recording was an insignificant part of the proof at trial, unmentioned by either party in closing arguments.  It certainly does not rise to the level of "a manifest injustice" that would call for a new trial.  *Ferguson*, 246 F.3d at 133.

## F.  The Recording of Kaufman's Grand Jury Testimony Was Properly Admitted

Kaufman's final argument for a new trial — that admission of the audio recording of her grand jury testimony violated Rule 403 of the Federal Rules of Evidence — is easily rejected for one simple reason: There is no basis to believe that the jury knew that one of the prosecutors, Assistant United States Attorney Daniel Richenthal, was also the prosecutor in the grand jury. His name was not mentioned in the recording and was redacted from the transcript of the recording.  (GX 1004, 1004-T).  Moreover, after hearing the tape recording played at trial, the Court observed that it was unable to recognize the voice on the tape as AUSA Richenthal's — despite being "quite familiar with Mr. Richenthal's voice" (both from presiding over this case

from its inception and from having worked with AUSA Richenthal before taking the bench).

(Tr. 944).  In light of those circumstances, the Court finds that no reasonable juror could have, or

would have, known that AUSA Richenthal was the prosecutor heard on the tape, rendering the

prejudice from admitting the tape non-existent.  Kaufman's assertion to the contrary — that the

jurors "*could* have" recognized AUSA Richenthal's voice (Reply Mem. 15) — is nothing more

than speculation, and speculation without foundation no less.  In any event, the remote

possibility that the jury might have recognized AUSA Richenthal's voice (or, for that matter,

mistakenly believed that the voice belonged to the other prosecutor at trial) is not a basis to

exclude the evidence, let alone to grant Kaufman a new trial, as she argues (Rule 33 Mem. 21

n.11).

 Nor is there any merit to Kaufman's argument that a new trial is warranted because the

Court failed to conduct a Rule 403 analysis with respect to the recording.  (Rule 33 Mem. 22-23;

Reply Mem. 15 n.13).  For one thing, the Second Circuit has made clear that "where the issues of

both the probative value and possible prejudicial effect of admitting prior act evidence are

presented to the district court when it makes its decision to admit such evidence, a mechanical

recitation of the Rule 403 analysis is not required."  *United States v. Pitre*, 960 F.2d 1112, 1120

(2d Cir. 1992).  That is the case here, as the parties addressed the probative value and potential

prejudicial effect of the recording at length in their motion papers.  (Docket Nos. 94, 103).

Moreover, even if the Court "was not as explicit as it could have been in identifying and

weighing the relevant indicia of probative value and prejudice," *United States v. Hayes*, 553 F.2d

824, 828 (2d Cir. 1977), it is plain from context that the Court performed the requisite balancing,

as it identified the recording as "in essence the best evidence whatsoever we could have about

what happened in the grand jury" (which was, of course, central to the issues at trial) and

25

explained why, in the circumstances of this case, there was "little or no danger" that AUSA Richenthal would "act in a way that would subtly impart his firsthand knowledge." (Tr. 11-14).[5]

Finally, nothing that happened at trial undermines the Court's initial assessment of the Rule 403 balancing. That is, AUSA Richenthal did nothing to make himself an "unsworn witness" at trial — let alone to a degree that would warrant either exclusion of the evidence or AUSA Richenthal's disqualification. *Cf. United States v. Regan*, 897 F. Supp. 748, 758 (S.D.N.Y. 1995) (Chin, J.) (rejecting a motion to disqualify the prosecutor in a perjury case based on the fact that she appeared in the grand jury on the ground that she would be an "unsworn witness," noting that "every lawyer in every trial is to some extent an 'unsworn witness'"), *aff'd*, 103 F.3d 1072 (2d Cir. 1997). In contending otherwise, Kaufman points to AUSA Richenthal's rebuttal summation, in which he argued about the meaning of questions posed to Kaufman and answers she gave in the grand jury. (Rule 33 Mem. 21-22). But those arguments were exclusively — and fairly — based on the record at trial. AUSA Richenthal did not argue about how the questions were asked or how they were answered based on his perceptions (or those of anyone else in the grand jury), and he never once suggested, much less contended, that the jury should credit his arguments because he was in the grand jury or because of anything that would not have been readily apparent to the jury from the evidence at trial

---

[5]    Although the transcript indicates that the Court stated "suddenly impart," it is plain from context that the Court stated "subtly impart." *Cf.* Fed. R. App. P. 10(e) (providing that a district court may correct errors in the transcript); *United States v. DiPietro*, No. 02 Cr. 1237 (SWK), 2007 WL 2164262, at *2-4 (S.D.N.Y. July 25, 2007).

(including the recording itself and the transcript of the grand jury proceeding).  In short, Kaufman fails to show that she was prejudiced in any way by admission of the recording.[6]

## CONCLUSION

For the foregoing reasons, Kaufman's motions for judgment of acquittal and a new trial are DENIED.  The Clerk of Court is directed to terminate Docket Nos. 147, 148, and 149.

SO ORDERED.

Dated: May 19, 2014
       New York, New York

JESSE M. FURMAN
United States District Judge

---

[6]     Kaufman's argument for a new trial fails for another reason: To the extent that AUSA Richenthal did become an unsworn witness, the Second Circuit has held "that the appropriate remedy is disqualification, not exclusion" of the evidence, *United States v. Dennis*, 843 F.2d 652, 656 (2d Cir. 1988), and Kaufman has never argued that AUSA Richenthal should have been disqualified.  (*See also* Tr. (explaining why disqualification would not be required even if the full recording of the grand jury proceeding was played at trial)).  Kaufman's unsupported suggestion that that "admonition" applies only to disqualification of defense counsel, and does not extend to disqualification of a prosecutor (Rule 33 Mem. 23 n.14), is without merit.  If anything, it is easier for a new prosecutor from the same office to take over a case than it is for a new defense lawyer (especially where, as in this case, a prosecutor without any plausible taint is already on the trial team).  Moreover, whereas substitution of defense counsel implicates a defendant's Sixth Amendment right to counsel of his or her choice, *see, e.g.*, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006), substitution of a prosecutor does not.